IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


BLIND INDUSTRIES AND            *
SERVICES OF MARYLAND <u>et al.</u>   *
                                *
v.                              *
                                *   Civil Action No. WMN-11-3562
ROUTE 40 PAINTBALL PARK         *
                                *
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

**<u>MEMORANDUM</u>**

Before the Court are cross motions for summary judgment.
ECF No. 22 (Plaintiffs') and ECF No. 24 (Defendant's).
The motions are ripe.  Upon a review of the pleadings and the
applicable case law, the Court determines that no hearing is
necessary, Local Rule 105.6, and that both motions must be
denied.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This case was brought pursuant to Title III of the
Americans with Disabilities Act (ADA), 42 U.S.C. § 12182, and
Maryland's "White Cane Law," Md. Code Ann., Hum. Servs. § 7-704.
Both statutory provisions prohibit discrimination against
individuals with disabilities by those who offer public
accommodations.  Plaintiff Blind Industries and Services of
Maryland (BISM) is a statutory, non-profit education and
training center for the blind.  BISM describes its mission as
both helping the blind reach their potential for living and

working independently and also as enhancing the public's attitudes concerning blindness. Compl. ¶ 5. One of the programs BISM offers is a Comprehensive Orientation, Rehabilitation, and Empowerment program (CORE) for blind adults. Participants in the CORE program are trained in Braille, cane travel, and other nonvisual mobility and life skill techniques.

One requirement of the CORE program is that each student must select, plan, organize, and lead a group social outing. In May 2011, one of the students in the CORE program, Darrell Holloway, selected paintball as his group social outing. Holloway located Defendant Route 40 Paintball Park (Route 40) on the internet. Route 40 is owned by Miriam Maliszewski and operated by Miriam and Thomas Maliszewski and their son, Julian. The park consists of four playing fields, ranging from 150 feet by 120 feet to one acre in area. Participants typically play for two hour time slots, rotating between all four fields.[1]

---

[1] The Court assumes the reader's general familiarity with the game of paintball. Briefly stated, however, and as described by Plaintiffs in the Complaint, "[t]he sport of paintball is played on a field of predetermined bounds by opposing teams seeking to eliminate opposing team members by shooting them with air-propelled, paint-filled gelatin balls called paintballs while attempting to complete a stated objective, which varies by game. Compl. ¶ 13. As described by Julian Maliszewski, "[t]he easiest way that I find it is to explain paintball is its capture the flag only we use paintball markers, so instead of the childhood version of tag we shoot each other with balls filled with paint." Dep. of Julian Maliszewski (hereinafter Julian Dep.) at 15. A typical paintball field, including those at Route 40, has large objects or "bunkers" placed throughout the field to

Holloway called Route 40 and made reservations for fifteen people for Saturday, May 21, 2011, from noon to 2:00 p.m.  When Holloway made the reservations, he was told to arrive 15 to 20 minutes before the scheduled time to complete waivers, secure the paintball guns and protective equipment, and to begin the mandatory safety orientation.  Holloway did not mention in making the reservations that the participants were blind.  No one in the group had previously been to this particular paintball park.

On the day of the reservation, a group led by Holloway and made up of two BISM instructors and six BISM students, traveled to the paintball park on foot from a bus stop that was several miles away.  Holloway had some difficulty getting to the facility and Route 40 called Holloway's cell phone several times to confirm that the group was going to make their reservation. Holloway also called Route 40 as many as eight times asking for directions to the facility.  There is a dispute in the record as to the exact time that the group finally arrived at the park. Some in the group testified that it was "around noon," Dep. of James Konechne at 119, and others at "around 12:15ish."  Dep. of Ronald Cagle at 74.  Route 40 personnel testified that the group

---

provide players places to hide and from which to shoot at opponents.

arrived between 12:45 p.m. and 1:00 p.m.  Julian Dep. at 36-37;
Dep. of Miriam Maliszewski (hereinafter Miriam Dep.) at 48.

When the group arrived at the park, they were all wearing
black "sleep shades."  While all of the group members were
legally blind, some were partially sighted and the purpose of
the shades was to remove any residual vision.  Plaintiffs
explain that wearing the shades during the outing was one of the
requirements of the CORE program.  Because many of the
participants in the CORE program have degenerative conditions
that will eventually cause total blindness, one of the goals of
the program is to teach the participants how to do everything
non-visually.  Konechne Dep. at 12.

As the group arrived at the park, the Route 40 personnel
testified that they observed the group having difficulty
navigating their way into the park.  Several members of the
group walked past the entrance and were directed back to the
park by a sighted bystander.  Once at the park, one of the
participants collided with one of the four inch by four inch
posts near the park entrance.  Decl. of Miriam Maliszewski ¶ 9.

The group then met with Miriam and Julian Maliszewski and
stated that they were there to play paintball.  Consistent with
Route 40's policies, the Maliszewskis insisted that each member
of the group read, complete and sign its waiver form.  When the
group members explained that they could not read the forms and

4

asked that the forms be read to them, the Maliszewskis refused. Miriam Maliszewski explains in her deposition that she "didn't feel that that is right" to read the waiver.  Miriam Dep. at 39. Julian stated that he did not believe that he was obligated to read the waiver and told them that they would have to supply their own sighted companion to read it.  It also appears from the record that the Maliszewskis' refusal to read the waiver form was motivated by their belief that blind participants could not safely play paintball unless assisted by sighted companions.

The members of the group attempted to explain to the Maliszewskis how they would be able to safely play paintball using the specialized navigation skills that they possessed and that were taught as part of the CORE program, including the use of their canes, echo-location via sound, and the use of code words and other auditory signals.  The Maliszewskis inquired if the group members had previously played paintball and while some responded that they had, they were unable to recall the names of the facilities at which they had played.  The Maliszewskis did not permit the group to play paintball but did offer to allow them to fire on the target range.  The group members declined and this suit followed.

In addition to BISM, Plaintiffs in this lawsuit are Marco Carranza and James Konechne, BISM instructors, and Ronald Cagle, a former BISM student.  All three individuals were part of the

group attempting to play paintball at Route 40 on May 21, 2011,
and all are legally blind.  In addition to separate counts under
the ADA and Maryland's White Cane Law, the Complaint includes a
claim for declaratory relief under the Declaratory Judgment Act,
28 U.S.C. § 2201.  As relief in this action, Plaintiffs seek a
declaration that Route 40's practices violate the ADA and the
White Cane Law and a permanent injunction prohibiting that
continued violation.

## II. LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure provides
that summary judgment "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A material fact is one that "might
affect the outcome of the suit under the governing law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
genuine issue over a material fact exists "if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party."  Id.  In considering a motion for summary
judgment, a judge's function is limited to determining whether
sufficient evidence exists on a claimed factual dispute to

warrant submission of the matter to a jury for resolution at trial.  Id. at 249.

When both parties file motions for summary judgment, as here, the court applies the same standards of review.  Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991); ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment - even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted).  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co., 627 F. Supp. 170, 172 (D. Md. 1985).

## III. DISCUSSION

Title III of the ADA forbids discriminating against persons with disabilities "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations."  42 U.S.C. § 12182(a). To establish a claim under this provision, plaintiffs must show that: (1) they have a disability (in this case, blindness); (2) that the defendant is a place of public accommodation; and (3)

that plaintiffs were denied full and equal treatment because of[2]

their disability.  Roberts v. Royal Atlantic Corp., 542 F.3d

---

[2] The parties disagree as to the correct causation standard under
the ADA.  Plaintiffs cite to a recent decision from the Fourth
Circuit, Halpern v. Wake Forest Health Sciences, 669 F.3d, 454
(4th Cir. 2012), for the proposition that "'[t]he ADA requires
only that the disability was "a motivating cause" of the
exclusion.'"  ECF No. 25 at 2 (quoting Halpern, 669 F.3d at
462).  This "motivating cause" language was adopted in Halpern,
without discussion, from a 1999 Fourth Circuit decision, Baird
ex rel. Baird v. Rose, 192 F.3d 462, 470 (4th Cir. 1999), and in
Halpern, this language was plainly dicta.  Halpern was resolved,
not on the issue of causation, but by a finding that the
plaintiff, with or without reasonable accommodation, was
unqualified under the ADA for the program in which he desired to
participate.

    Baird fell in a line of ADA cases that borrowed the
causation standard from Title VII of the Civil Rights Act of
1964, as amended (Title VII).  In 2009, the Supreme Court in
Gross v. FBL Financial Servs., Inc., cautioned against
incorporating Title VII's "motivating factor" standard into
other civil rights statutes, observing that courts "must be
careful not to apply rules applicable under one statute to a
different statute without careful and critical examination."
557 U.S. 167, 174-75 (2009).  Gross addressed the importation of
Title VII's motivating factor standard into the Age
Discrimination in Employment Act but, since Gross, several
circuits have applied its teaching to the ADA.  See Lewis v.
Humboldt Acquisition Corp., Inc., 681 F.3d 312, 317-22 (6th Cir.
2012) (rejecting the "motivating factor" standard in favor of a
more rigorous "but-for" standard); Serwatka v. Rockwell
Automation, Inc., 591 F.3d 957, 961-64 (7th Cir. 2010) (same).

    This Court finds persuasive the reasoning of Lewis and
Serwatka and predicts that, when directly presented with the
issue, the Fourth Circuit will follow its sister circuits.  The
Court does not believe, however, that the selection of one
causation standard over another is dispositive of these summary
motions.  Should this case proceed to trial, the Court will, of
course, need to resolve the issue for the purpose of jury
instructions.  In the meantime, however, it will leave the
proper causation standard as an open question.

363, 368 (2d Cir. 2008).  In this action, there is no dispute
that the individual Plaintiffs are disabled for purposes of the
ADA.[3]  There is also no dispute that Route 40 is a place of
public accommodation.

To satisfy the third element, Plaintiffs assert that Route
40 discriminated against them in three specific ways.  First,
Route 40 is alleged to have discriminated by failing to ensure
effective communication of the park's waiver form in violation
of 42 U.S.C. § 12182(b)(2)(A)(iii).[4]  Route 40 has no braille or
other accessible copy available and its staff repeatedly refused
to read the form to Plaintiffs.  Second, Route 40 is alleged to
have discriminated by imposing eligibility criteria that
screened out persons with disabilities in violation of 42 U.S.C.
§ 12182(b)(2)(A)(i).[5]  This alleged violation is also related to

---

[3] There is also no dispute that BISM has standing to pursue these
claims.

[4] 42 U.S.C. § 12182(b)(2)(A)(iii) includes within the scope of
prohibited discrimination:

> a failure to take such steps as may be necessary to
> ensure that no individual with a disability is
> excluded, denied services, segregated or otherwise
> treated differently than other individuals because of
> the absence of auxiliary aids and services, unless the
> entity can demonstrate that taking such steps would
> fundamentally alter the nature of the good, service,
> facility, privilege, advantage, or accommodation being
> offered or would result in an undue burden;

[5] 42 U.S.C. § 12182(b)(2)(A)(i) includes within the scope of
prohibited discrimination:

the waiver form: Route 40 imposes the independent reading of the form as a precondition to playing paintball, a requirement that, according to Plaintiffs, bears no relation to Plaintiffs' ability to play paintball.

Third, Plaintiffs challenge Route 40's ultimate decision to deny them the opportunity to play paintball and to relegate them to the separate and unequal status and experience of firing on the shooting range.  In addition to the enforcement of the waiver precondition, Route 40 also enforces a rule that states, "[b]lind shooting is not allowed.  Look at what you are shooting."  Plaintiffs contend that the adoption of this rule is "facially illicit."  ECF No. 25 at 3.  Plaintiffs also protest that Route 40 made the decision to deny them the opportunity to play paintball without first making an individualized assessment of their ability to safely participate.

In defending this suit, Route 40 relies on two primary arguments.  First, Route 40 notes that the ADA permits public accommodations to impose eligibility criteria that will screen

the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

10

out individuals with disabilities when that eligibility criteria is "necessary" for the activity.[6]   Route 40 describes paintball as a dangerous sport, involving the risk of "serious injury or death."  ECF No. 24-1 at 2.  According to Route 40, paintball pellets "are capable of rendering a person unconscious and even killing."  Id.  Because of those risks, paintball facilities "universally require players to sign liability waivers."  Id.

Route 40 also identifies those same dangers and risks as the justification for the "no blind shooting" rule:

> First, it ensures that unsuspecting participants, including referees and teammates, are not randomly shot.  Second, it is designed to limit shots to high risk areas.  For instance, because paintball goggles do not cover the back of the head, players are at risk of being shot in the back of their heads, especially by their teammates, who are more likely to be behind them than their opponents.  Shots to certain exposed parts of the head, like behind the ear, can produce

---

[6] See 28 C.F.R. § 36.301, which provides:

> (a) General.  A public accommodation shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered.

> (b) Safety. A public accommodation may impose legitimate safety requirements that are necessary for safe operation.

(emphasis added).

serious injury. Third, the rule also helps to ensure
that participants will not be shot at close range,
which enhances the danger of the activity.

Id. at 13 (citations to the record omitted).

In a closely related argument, Route 40 relies on a "direct

threat" defense.[7] The ADA does not require public accommodations

to permit individuals with disabilities to participate in

activities if that participation would pose a "direct threat to

the health or safety of others." 42 U.S.C. § 12182(b)(3).[8]

While Plaintiffs suggest that Defendant "persists in its

misunderstanding that the direct threat defense includes a risk

_____

[7] Plaintiffs note that Maryland's White Cane Law does not
explicitly include a direct threat defense. The White Cane Law,
however, does permit subjecting the rights and privileges of
individuals with disabilities to "any conditions and limitations
of general application established by law." Md. Code Ann., Hum.
Servs. § 7-704(b)(1). The Maryland statute that generally
governs discrimination in places of public accommodation, Md.
Code Ann., State Gov't § 20-301 et seq, specifies that public
accommodations are not prohibited "from denying services to any
person for failure to conform to the usual and regular
requirements, standards, and regulations of the establishment."
Id. § 20-302.

[8] Section 12183(b)(3) provides:

  Nothing in this subchapter shall require an entity to
  permit an individual to participate in or benefit from
  the goods, services, facilities, privileges,
  advantages and accommodations of such entity where
  such individual poses a direct threat to the health or
  safety of others. The term "direct threat" means a
  significant risk to the health or safety of others
  that cannot be eliminated by a modification of
  policies, practices, or procedures or by the provision
  of auxiliary aids or services.

to self," ECF No. 25 at 20 n.14, the direct threat defense certainly encompasses as "others" the other individuals in the group and the Court understands Route 40 to be making that argument.  In addition, Route 40 posits a risk to referees in the paintball fields and nearby bystanders who might be hit by errant shots.

In addition to these two legal arguments, Route 40 presents the factual assertion that the group's late arrival was "the single most important determining factor" as to why the group was not permitted to play paintball.  ECF No. 24-1 at 10.  Route 40 contends that

> [t]he process of complying with the park's prerequisites to playing, in light of the accommodations and modifications necessary to ensure that all of the safety information and instructions were adequately communicated to the group members, coupled with the additional steps needed for the group members to acquaint themselves with the paintball fields, would have consumed the entirety of the time remaining on their reservation, making it impossible for them to play before the groups reserving the four 2:00 p.m. slots were to begin.

Id.  Defendants suggests that the orientation process is "primarily visual" and, thus, to orient blind individuals, significantly more time and personnel would be needed.

The Court finds that, at this stage in the litigation, neither side is entitled to judgment as a matter of law.  The Court acknowledges, however, that Plaintiffs come significantly closer to meeting their burden.  First, it would appear that

13

Defendant violated the ADA by refusing to read the waiver form
or otherwise provide Plaintiffs with access to the form.  At the
time, Route 40 offered little reason for its refusal, beyond the
Maliszewskis' opinion that they had no obligation to do so.
Miriam Maliszewski testified that she refused as a personal
decision: "I don't read my waiver form to anybody."  Miriam Dep.
at 51.  As noted above, Julian Maliszewski testified that it was
his opinion "[i]f they cannot fill out that form themselves then
I'm under the impression that they are not able to play by
themselves."  Julian Dep. at 45.

     In briefing the pending motions, Route 40 appears to argue
that reading the form was somehow an "undue burden."  See ECF
No. 24-1 at 10 n.4 (citing ADA Technical Assistance Manual §
III-4.3000 Illustration for the proposition that "requirement of
reading information to a blind shopper may be an undue burden if
store is extremely busy").  In that same footnote, Route 40
appears to suggest that the validity of the waiver might be
called into question if the waiver is read to, as opposed to
read by, the participant.  Given that the one page form could be
read in a matter of minutes, an assertion of undue burden is
questionable at best.  See 25-11 (Waiver Form).  One could,
perhaps, read into the Maliszewskis' previous explanations for
refusing to read that waiver some concern about the efficacy of
that procedure, but that concern was not communicated to

Plaintiffs at the time.  Furthermore, if Route 40 had a legitimate reason for refusing to read the waiver, it still was under an obligation to provide some alternative form of effective communication.  <u>See</u> ADA Technical Assistance Manual § III-4.3600 ("the fact that providing a particular auxiliary aid or service would result in a fundamental alteration or undue burden does not necessarily relieve a public accommodation from its obligation to ensure effective communication.  The public accommodation must still provide an alternative auxiliary aid or service that would not result in an undue burden or fundamental alteration but that would ensure effective communication to the maximum extent possible, if one is available.").

A finding that Route 40 had violated the ADA by not making its waiver form available to the blind, however, would be a hollow victory if Route 40 is correct that the rule against blind shooting is a necessary criteria or that allowing the blind to play would constitute a sufficient "direct threat." Again, while evidence does not ultimately tip the scale one way or the other, the evidence on these issues weighs heavily against Route 40.

It is interesting that, in its motion, Route 40 characterizes the rule as one "requiring players to <u>perceive</u> what they are shooting."  ECF No. 24-1 at 13 (emphasis added). Plaintiffs contend that the skills taught in the CORE Program

15

allow them to do just that, albeit non-visually.  They argue

that if permitted to play, they would:

> - use their canes to navigate the paintball field,
> including locating obstacles;
>
> - strategically locate targets by listening for
> players moving on the course and using pre-established
> code words or sounds to differentiate between friend
> and foe;
>
> - using a code word or sound strategy, fire their
> paintball guns only at someone they knew to be an
> opponent, and never at a close range;
>
> - know how to distinguish between high and low
> targets;
>
> - avoid shooting the referee by discussing with the
> referee beforehand where he will be and informing him
> of the code word strategy or encouraging the referee
> to announce himself during play.

ECF No. 25 at 15-16 (citations to the record omitted).

Plaintiffs' ability to use these techniques would also minimize

the "direct threat" Plaintiffs might pose to others by playing

paintball.

Without directly challenging any of these purported

abilities, Route 40 in its reply brief recasts the rule against

blind shooting as a rule "which requires <u>all players</u> to <u>visually</u>

perceive the target at which they are shooting."  ECF No. 27

(first emphasis added by Route 40, second emphasis added by the

Court).  Route 40 offers no explanation for the change from

perception to visual perception.

16

As to Route 40's factual assertion that Plaintiffs' late arrival made it impossible for them to play, there is, as noted above, a serious dispute of fact as to what time they actually arrived.  Even assuming they had arrived at the latest of the proffered times, there is also a dispute as to how long it would take for them to receive the orientation and equipment and whether or not they could have played some games before the expiration of their reserved time.  Furthermore, when denying Plaintiffs the opportunity to play, Route 40 cited the inability to complete the waiver as the reason they could not play, not the lateness of their arrival.

There is some evidence favoring Route 40's position that prevents the Court from entering judgment in Plaintiffs' favor at this time.  Based upon the eight telephone calls made to Route 40 seeking assistance finding the facility, Route 40 personnel would have some grounds to question the effectiveness of Plaintiffs' navigational skills.  Miriam Maliszewski testified that, as the Plaintiffs arrived, she observed them walk past the facility and be redirected to the park by a sighted individual.  Perhaps most significant, she states that she observed one of the group walk into a post.  Route 40's conclusion that Plaintiffs were unable to safely play paintball had some basis.

After observing Plaintiffs' difficulty in effectively and safely navigating to the park, Route 40 made some attempt to make an individualized assessment of Plaintiffs' abilities to play paintball, nonetheless.  They inquired about Plaintiffs' prior experience with the sport but those that had played previously were unable to recall where it was that they had played.  Route 40 also correctly notes that, while Plaintiffs have presented to the Court expert testimony explaining how they would have been able to use their training to safely play, that expert testimony was not available at the time.

While Route 40's position that Plaintiffs' late arrival at the facility was "the single most important determining factor" in the decision to preclude them from playing paintball is not well supported by the evidence, their late arrival may have had some impact on their ability to play.  Plaintiffs argue that in making the determination as to whether Plaintiffs posed a direct threat to others, Route 40 was required to make a "fact intensive" assessment as to: "the nature, duration, and severity of the risk, and the probability that the potential injury will occur."  ECF No. 22 at 26 (citing A Helping Hand, LLC v. Baltimore Co., Civ. No. 02-2568, 2006 WL 2067942 at *1 (D. Md. July 14, 2006)).  Plaintiffs stress that this assessment must be "individualized" and that a determination of the nature of the risk, the duration of the risk, the severity of the risk, the

18

probability of the potential injury, and whether reasonable modifications would mitigate the risk must be made as to each of the potential participants.  ECF No. 27-28.  It is undisputed that the paintball park was very crowded and busy on the date in question.  If Plaintiffs did arrive as late as 1 o'clock, one hour and fifteen minutes later than the time that they were instructed to arrive, it is questionable whether that individualized assessment could be made, the orientation given, and equipment supplied, with sufficient time remaining to play paintball.

The record also suggests that the communications regarding Plaintiffs' skills and abilities that did occur may have been less than ideal.  Having read Mr. Carranza's explanation given in his deposition as to how he planned to use environmental clues, code words and his cane to navigate and play, it is not entirely clear to the Court how he would have been able to safely participate in paintball.  Some of his assertions as to his mobility skills seem difficult to believe.  He asserts that he could maneuver through the course as fast as a sighted person.  Carranza Dep. at 117-19.  While that may be true, if that representation were made to the Maliszewskis, it would not be unreasonable for them to question that assertion.

Furthermore, although Route 40 does not raise it as a significant issue, at some point in the verbal exchange,

19

communications seem to have broken down.  It appears that tensions may have quickly arisen.  Julian Maliszewski testified that members of the group got "riled up" and yelled at him and his mother.  Julian Dep. at 46.  Plaintiff Konechne acknowledged that, after the long walk to the park in the heat and the confrontation about the waivers, the members of the group were "all mad."  Konechne Dep. at 137.  Edwin Parsons, a friend of the Maliszewskis who was at the facility and observed the conversation, testified that Plaintiffs were "aggressive and hostile."  Parsons Dep. at 44.[9]

The Court is compelled to make one additional observation. In the opening paragraphs of Route 40's reply brief, counsel opines that the ADA, Maryland's White Cane Law, and "old-fashioned common sense" recognize that some activities involve sufficient risk that individuals with disabilities, like blindness, should only participate in those activities with assistance or under modified conditions.  ECF No. 27 at 2.  It could be that Route 40 has legitimate concerns regarding Plaintiffs' abilities to safely play paintball.  It could also be that what is offered as "old fashioned common sense" is really nothing more than paternalistic and unsupported

---

[9] Most of the testimony would support the conclusion that tempers arose only _after_ Plaintiffs were told they would not be able to play.  If so, the fact that Plaintiffs became angry and voices were raised would not be a factor in Route 40's defense.

assumptions about what individuals with disabilities are able to achieve and accomplish.

**IV. CONCLUSION**

Again, while the evidence points to a finding that Route 40 violated the ADA in denying Plaintiffs the opportunity to play paintball on May 21, 2011, the Court cannot conclude that a reasonable jury might find otherwise.  Accordingly, both motions will be denied.  A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: December 5, 2012.